IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ROGER RODENBERG, | : | Case No. 1:08-CV-671 |
| | : | |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER DENYING |
| | : | DEFENDANT'S MOTION FOR |
| HILL AND GRIFFITH COMPANY, | : | SUMMARY JUDGMENT |
| | : | |
| Defendant. | : | |

This matter is before the Court on Defendant Hill and Giffith Company's Motion for Summary Judgment. (Doc. 17.) Plaintiff Roger Rodenberg, a former employee of Defendant, brought this action against Defendant Hill and Giffith Company ("Hill & Griffith"), alleging age discrimination claims under federal and Ohio law. (Doc. 1.) Defendant moves for summary judgment as to both of Plaintiff's claims and Plaintiff opposes Defendant's motion. For the reasons that follow, the Court **DENIES** Defendant's Motion for Summary Judgment.

I.      BACKGROUND

This suit centers on Plaintiff Rodenberg's allegation that his former employer, Defendant Hill & Griffith, discriminated against him on the basis of his age when it terminated him. At the time of Plaintiff's termination, Defendant Hill & Griffith's business included blending powdered materials into pre-blended sand additives for the foundry industry.[1] (David Greek, Jr. Dep. 11; Dale Walsh Dep. 9.) Hill & Griffith sold the pre-blend product line to S&B Industrial Materials on October 3, 2007. (Greek, Jr. Dep. 23; Welsh Dep. 9-10.) Prior to the sale, Hill & Griffith

---

[1] The sand mixture was used in the foundry industry to create molds for the production of metal parts. (Roger Rodenberg Dep. 15-16.)

1

operated a number of plants in various locations.  The primary operation at three of those facilities -- the Chicago, Birmingham, and Cincinnati plants -- was to grind coal, which the company then blended with other materials to produce foundry and sand additives.  (Greek, Jr. Dep. 11, 16-17.)  The coal used in this process was delivered straight from coal mines in pieces of varying size.  (Roger Rodenberg Dep. 18-19.)  Hill & Griffith then ground the coal into different size particles depending on the customers' needs.  (*Id.*)  Customers could purchase the ground coal in pure form or could purchase pre-blended mixtures of the ground coal, clay, and other materials.  (*Id.* at 19-20.)  Foundries combined the coal mixtures with sand, which they then used to create molds for the production of metal parts.  (*Id.* at 15-16, 20.)

The Plaintiff, Roger Rodenberg (D.O.B. 12/10/53), began working for Hill & Griffith in 1978.  Rodenberg's first position was in the Cincinnati plant's quality control department, where he tested coal to insure it met customer specifications.  (Rodenberg Dep. 15-16.)  The Cincinnati plant, located near the corporate headquarters for Hill & Griffith, was the largest of Hill & Griffith's plants.  (Greek, Jr. Dep. 36; Welsh Dep. 47.)  After a few years in quality control, Rodenberg moved to a production position.  (Rodenberg Dep. 22.)

In 1986, Hill & Griffith promoted Rodenberg to the manager position at the Burbank, Ohio plant.  (*Id*. at 23.)   The Burbank plant did not grind its own coal.  Instead, it received ground coal from the Cincinnati plant and then blended the coal with other materials to create the pre-blend mixtures described above.  (*Id*. at 24.) While managing the Burbank plant, Rodenberg's main responsibilities included running the overall operation of the plant, making sure orders were filled on a timely basis, hiring employees, and overseeing maintenance.  (*Id*. at 23.)  Rodenberg reported to Ray Sparks, who was at that time the manager of the Cincinnati

plant. (*Id*. at 25, 30-31.) During the time period Rodenberg managed the Burbank plant, there were several issues with cleanliness of the plant. When Sparks visited the plant in 1991, he noted that the plant was a total mess and expressed concern that there was dirt in the manufacturing area and all other areas of the plant. (*Id*. at 41.) At that point there were only two employees working under Rodenberg. (*Id*. at 42.) No one person was in charge of maintenance; instead, maintenance responsibilities were shared between Rodenberg and the two other employees. (*Id*.) After receiving Sparks' feedback, Rodenberg attempted to clean up the factory and keep it clean. (*Id*. at 42-43.) However, when Sparks visited the following year, in 1992, he noted persistent cleanliness problems. (*Id*. at 58.) One of his main concerns was that due to spillage during the manufacturing process, product was being wasted. (*Id*.)

Despite the cleanliness problems, Rodenberg was offered the position of plant manager of Defendant's Cincinnati facility in 1993. (Rodenberg Dep. at 62.) The transfer came with a raise in salary as well as an increase in duties. (*Id*. at 63-64.) The Cincinnati plant was about twice the size of the Burbank plant, and Rodenberg was given more responsibility than he had at the Burbank plant. (*Id*.) For example, he was responsible for ordering all new parts for the plant and oversaw approximately twenty employees. (*Id*.) Additionally, Rodenberg reported directly to the CEO of Hill & Griffith, who was at that time David Greek Sr. (*Id*. at 25, 67.)

At some point during the early 2000s, David Greek, Jr. began supervising Rodenberg. (Greek, Jr. Dep. 9-10.) Greek, Jr. was at that time the Vice President of Administration at Hill & Griffith. (*Id*.) Rodenberg continued to have maintenance and cleanliness issues after becoming manager of the Cincinnati plant. (Rodenberg Dep. 68.) As a result, in 2002, plaintiff did not receive a full raise. (*Id*.) In early 2003, Greek, Jr. prepared a performance appraisal for

Rodenberg. (*Id*. at 81-82.) On the March 21, 2003 performance evaluation form, Greek, Jr. gave Rodenberg an overall rating of 89.88 out of 100. (Doc. 19-1 at 1.) Although he described Rodenberg as a "good employee," Greek, Jr. also noted that Rodenberg needed to address plant cleanliness and plant attitude and morale. (*Id*.) Greek, Jr. described the Cincinnati plant as one of the dirtiest of all of Hill & Griffith's plants.[2] (*Id*.) Rodenberg agreed with this evaluation. (Rodenberg Dep. 82.)

In addition to the cleanliness problems, Rodenberg also had difficulty maintaining the equipment at the plant and staying within his maintenance budget. Every year, Rodenberg was responsible for creating a budget for maintenance and repair expenses. (Rodenberg Dep. 89.) In 2004, plaintiff went over his $240,000 maintenance and repair budget by almost $250,000, over one hundred percent of his budget. (*Id*. at 132-34.) According to Defendant, in early 2005, the Cincinnati plant began to have problems with the equipment breaking down because it was not maintained properly. (Matt Mattscheck Aff. ¶ 12.) A former employee of Hill & Griffith who worked at the Cincinnati plant during that time period states in an affidavit that under Rodenberg's supervision, plant equipment was not adequately maintained, leading to expensive repairs and replacement of equipment. (*Id*. ¶¶ 13-15.) One recurring problem was the break down of equipment due to debris in the coal that was delivered for grinding. (Rodenberg Dep. 102-108.) This problem occurred more frequently at the Cincinnati plant than it did at the Birmingham or Chicago plants where coal was also ground. (*Id*. at 102.) Equipment failures sometimes caused unscheduled down time resulting in loss of money. (*Id*. at 109.)

Defendant also contends that it lost approximately $122,000 due to Rodenberg's failure

---

[2] It is unclear how often Greek, Jr. made unscheduled visits to the other plants. Greek, Jr.'s office was within walking distance from the Cincinnati plant. As a result he was able to frequently observe the state of the plant. (Greek, Jr. Dep. at 36-38.)

to make sure that all of the clay delivered to the plant was actually unloaded from the rail cars prior to releasing the cars to be sent back to the supplier. (*Id*. at 180-81, 192.) Rodenberg's practice was to instruct employees to knock on the sides of the tank cars and determine based on the sound whether they were empty or contained clay. (*Id*. at 181.) He did not ask the employees to open the tank cars to visually verify that they had been fully unloaded. (*Id*. at 180-81.) Because the rail cars often were not fully unloaded, raw materials that were already purchased by Hill & Griffith would be returned to the supplier at a loss to Hill & Griffith. (*Id*.) After being notified of the problem, the individual responsible for checking the cars started to visually inspect them. (*Id*. at 182.)

Defendant maintains that because of the deficiencies described above, Greek, Jr. had concerns about Rodenberg's continued management of the plant and discussed terminating Rodenberg with several other members of Hill & Griffith management. (Greek, Jr. Dep. 41-47.) Greek, Jr. started interviewing replacements for Rodenberg in the fall of 2006. (*Id*. at 59-60.) On March 7, 2007, in the presence of Hill & Griffith's Vice President of Finance, Dale Welsh, Greek, Jr. terminated Rodenberg. (*Id*. at 58-60.) Defendant hired Eric Adams, born in 1967, to replace Rodenberg. (Welsh Dep. 68-69, Ex. 6; Shirley Mote Dep. Ex. 3.) Adams had not previously worked for Hill & Griffith, but had worked as a plant manager in other manufacturing settings. (Welsh Dep. Ex. 6.) Hill & Griffith continued to employ Adams until November 4, 2007 when it sold the pre-blend operation, including the Cincinnati, Burbank, Chicago and Birmingham plants, to S&B Industrial Minerals. (Greek Dep. 27-30; Mote Dep. 44.) At the time of the sale, Hill & Griffith terminated many of the employees involved in the manufacturing of pre-blend foundry products, and S&B hired most of the terminated employees, including Adams.

(Mote Dep. 44; Welsh Dep. 14-15, 40.)

Rodenberg concedes that during the period he served as manager of the Cincinnati plant there were continuous problems, but he argues that the primary reason for his termination was his age. (Rodenberg Dep. 68.) With regard to the maintenance and cleanliness issues, Rodenberg contends that when Greek, Jr. became his supervisor, Greek, Jr. refused to provide him the resources necessary to perform his duties. For example, Rodenberg claims that when the plant began experiencing more problems with debris in the coal, Rodenberg complained about the quality of the coal, but nothing was done. (*See* Welsh Dep. 49-50, Ex. 4; Greek, Jr. Dep. 73.) According to Rodenberg, when the coal supplier loaded its barges, foreign objects, such as rubber and wood, frequently combined with the coal. (Rodenberg Dep. 101-04.) The person in charge of unloading the coal at Hill & Griffith had some responsibility to sift through the coal and remove any foreign objects. (*Id*. at 102.) However, it was difficult for that person to catch everything, especially on days when a lot of coal was delivered. (*Id*.) Foreign objects that were not removed from the coal sometimes choked up the coal crusher, requiring immediate maintenance. (*Id*. at 101-03.)

Rodenberg maintains the other plants had less problems because the coal they received was cleaner. (*Id*. at 102-03.) The Birmingham plant received its coal from a different supplier. (*Id*. at 103.) The Chicago plant received coal from the same mine that supplied the Cincinnati plant, but Chicago's coal was loaded at a different location. (*Id*. at 113.) Rather than consider switching to a different coal supplier, Greek, Jr. instructed Rodenberg to have one of his employees visually inspect all of the coal as it was unloaded and remove contaminants. (Greek, Jr. Dep. 73.) Rodenberg requested permission to hire another employee to perform that task,

indicating that he did not have enough manpower to adequately and consistently sift through the coal, but Hill & Griffith denied his request.  (Rodenberg Dep. Ex. 17.)  An email from Gary Miller, Defendant's Director of Purchasing, to Rodenberg, Greek, Jr. and others, shows that as of March 5, 2007, two days prior to Rodenberg's termination, Hill & Griffith was considering purchasing a different type of coal due to the ongoing problems with coal contamination.  (Welsh Dep. Ex. 4.)

Rodenberg contrasts the experience he had with Greek, Jr. during his last few years at Hill & Griffith with his previous experience working directly under Greek, Sr.  According to Rodenberg, he met with Greek, Sr. on a daily basis to discuss the plant.  (Rodenberg Dep. 67.)  In contrast, Greek, Jr. rarely visited the plant to discuss operations.  (Rodenberg Aff. ¶ 8.)  Rodenberg also claims that Greek, Jr. subjected him to greater scrutiny than other plant managers, citing the following sentence from Rodenberg's 2003 performance review: "Roger has done a very good job dealing with adversity, he has the largest operation to manage and is under the most scrutiny."  (Doc. 19-1 at 1.)  Rodenberg also notes that such performance appraisals were not routine.  The 2003 performance appraisal was the only such review Rodenberg received during his entire career at Hill & Griffith.  (Rodenberg Dep. 85.)

Rodenberg also claims that Greek, Jr. made ageist comments and acted discriminatorily toward older employees.  As an example, Rodenberg claims that in the fall of 2006, during a cocktail hour at a meeting of the plant managers, Greek, Jr. stated that his most pressing problem was the sixty-year-old salesmen, and his secondary problem was the fifty-year-old managers.  (*Id*. at 228-32; Rodenberg Aff. ¶¶ 18-20; Greek, Jr. Dep. 66-67.)  At that time, Rodenberg fell into the group of fifty-year-old managers.  (Greek, Jr. Dep. 66.)  Greek does not deny making

7

those statements, but claims he made those comments during a meeting regarding succession planning and that his concern was that if all of those employees retire at the same time, there would be a problem replacing all of them. (*Id*. at 66-67.) Welsh also recalled a succession meeting where comments were made distinguishing younger employees from older employees, but according to Welsh, the meeting took place in December 1999 or 2000, long before the time when Greek, Jr. is alleged to have made the statement regarding sixty-year-old salesmen and fifty-year-old managers. (*See* Welsh Dep. 97-98.)

When asked whether, outside of that particular meeting, he had ever heard Greek, Jr. "refer to certain salesmen as the older salesmen versus the younger salesmen," Welsh responded: "We all refer to them like that. Because the older salesmen only sold the Premix or seacoal carbonates. The other guys sold the full product line." (*Id*. at 98-99.) Welsh further testified that training related to the newer product lines was available for the older salespeople, but that many opted not to market those products because "they were comfortable with their living at the present level" and "didn't worry about increasing their income." (*Id*. at 99-100.) In line with Welsh's testimony, Donald Nuss, the Director of Environmental Health and Safety for Hill & Griffith, also testified that there was a "shared opinion" that the older salespeople were "slowing down a bit." (Donald Nuss Dep. 48.)

Finally, Rodenberg claims that during a meeting in August 2006, Greek, Jr. commented that the younger salespeople were concentrating their efforts on the hydraulic market, which had a phenomenal potential for growth. (Rodenberg Aff. ¶ 17.) Rodenberg argues that the fact that younger people were focusing on the hydraulic market is significant because after Hill & Griffith sold its pre-blend product line to S&B Industrial Minerals, Hill & Griffith's primary remaining

8

area of business was manufacturing custom chemicals and reselling hydraulic fluids. (Greek, Jr. Dep. 11.)

Despite the ongoing problems, Rodenberg's salary rose steadily over the years, increasing by nearly $40,000 between his promotion to Cincinnati Plant Manager in 1993 and his termination in 1997. (Rodenberg Aff. ¶¶ 5-6.) In addition, at the end of 2006, only months before he was terminated, he received a bonus. (*Id.* ¶ 26.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial."[3] Fed. R. Civ. P. 56(e). The task of the Court is not "to weigh the

---

[3] When reviewing the evidence set forth by both the moving and non-moving parties, the Court must carefully review "those portions of the submitted evidence designated by" both parties. *Guarino v. Brookfield Twp. Tr's.*, 980 F.2d 399, 410 (6th Cir. 1992). The Court is not

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when the evidence is not "so one-sided that one party must prevail as a matter of law." *Id*. at 252.

## III.     ANALYSIS

Defendant Hill & Griffith moves for summary judgement as to Rodenberg's federal and state law age discrimination claims. Rodenberg brings his age discrimination claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*. (the "ADEA") and Ohio Revised Code Chapter 4112. Because Ohio Rev. Code Chapter 4112 parallels the federal discrimination statutes, the Court analyzes both of Rodenberg's age discrimination claims under the ADEA. *See Green v. Fidelity Investments*, No. 09-3247, 2010 WL 891311, at *3 n.2 (6th Cir. Mar. 15, 2010); *Whitt v. Lockheed Martin Utility Serv., Inc.*, 209 F. Supp. 2d 787, 792 (S.D. Ohio 2002); *Plumbers and Steam Fitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 196 (1981).

The ADEA prohibits an employer from failing or refusing to hire, discharging, or discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . .." 29 U.S.C. § 623(a)(1). A plaintiff may establish a violation of the ADEA by either direct or circumstantial evidence. *See Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009); *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008). Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). "Circumstantial evidence, on the other hand, is

---

required to "sua sponte comb the record from the partisan perspective of an advocate for the non-moving [or moving] party." *Id.*

proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (internal quotation marks omitted).

Rodenberg argues that he can establish a violation of the ADEA through either direct or circumstantial evidence. As to the first method of proof, Rodenberg's claims that Greek's statement about his problems with the sixty-year-old sales force and fifty-year-old managers amounts to direct evidence of age discrimination. The Court finds it questionable that, in the context of this case, that statement alone amounts to direct evidence of discriminatory intent. *See Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) ("'[S]tatements by non-decision makers, or statements by decision makers unrelated to the decisional process itself [can not] suffice to satisfy the plaintiff's burden' of demonstrating animus." (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989))); *Rowan,* 360 F.3d at 550-51. Accordingly, the Court at this time declines to delve further into the direct evidence analysis and turns, instead, to the question whether Rodenberg set forth sufficient circumstantial evidence to survive summary judgment.

The Court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), where a plaintiff relies on circumstantial evidence to establish a violation of the ADEA.[4] Under that framework, Rodenberg first must set forth a

---

[4] Although the Supreme Court has not definitively decided whether the *McDonnell Douglas* framework applies to ADEA claims and expressly declined to address that question in *Gross v. FBL Financial Services, Inc.*, --- U.S. ----, 129 S. Ct. 2349 n.2 (2009), the Sixth Circuit has consistently found "the *McDonnell Douglas* framework useful in analyzing circumstantial evidence of ADEA claims." *Geiger*, 579 F.3d at 622. In several post-*Gross* opinions, the Sixth Circuit continued to apply the *McDonnell Douglas* framework in ADEA cases on the basis that absent any inconsistent decision of the Supreme Court or an *en banc* decision of the Sixth Circuit, the Sixth Circuit remains bound by its prior published decisions. *See id.*; *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 n.2 (6th Cir. 2010); *Johnson v. Franklin*

prima facie case of discrimination. *See Geiger*, 579 F.3d at 622. To establish a prima facie case where the plaintiff alleges he was discharged due to age discrimination, the plaintiff must demonstrate that: 1) he was at least forty years old at the time of the alleged discrimination; 2) he was discharged; 3) he was otherwise qualified for the position held; and 4) he was replaced by a younger individual. *See id*. at 622; *Burzynski v. Cohen*, 264 F.3d 611, 622 (6th Cir. 2001); *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 420 (6th Cir. 1999). Hill & Griffith does not dispute that Rodenberg can establish a prima facie case of age discrimination.

Accordingly, the burden of production shifts to Hill & Griffith to provide a nondiscriminatory reason for its employment decision. *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). If Hill & Griffith satisfies this burden of production, then Rodenberg must prove by a preponderance of the evidence that the employer's proffered reason was not its true reason but was, in fact, a pretext for illegal discrimination. *See Burdine*, 450 U.S. at 256. The Supreme Court recently clarified that regardless of whether the plaintiff attempts to make his case through direct or circumstantial evidence, the burden of persuasion remains on ADEA plaintiffs to demonstrate "that age was the 'but-for' cause of their employer's adverse action." *Gross v. FBL Financial Services, Inc.*, --- U.S. ----, 129 S. Ct. 2343, 2351 n.4 (2009).

Hill & Griffith maintains that it terminated Rodenberg because he was not properly carrying out his duties as plant manager, specifically with regard to plant maintenance, cleanliness, and safety.[5] Defendant having articulated a legitimate nondiscriminatory reason for

---

*Farmers Co-op.*, No. 09-5483, 2010 WL 1994853, at *2 (6th Cir. May 19, 2010); *Johnson v. Interstate Brands Corp.*, 351 F. App'x 36, 39 n.3 (6th Cir. 2009).

[5] Rodenberg at times suggests the Court should analyze Hill & Griffith's alleged basis for terminating him as encompassing multiple independent reasons for his discharge. *See* doc. 19 at

terminating Rodenberg, the burden now shifts to Rodenberg to demonstrate pretext by showing that the employer's proffered reason for an adverse employment decision had no basis in fact, did not actually motivate the decision, or was insufficient to motivate the decision. *Ladd v. Grand Trunk Western R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2006) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). As the Sixth Circuit explained in *Manzer*,

> The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are "factually false." [*Baxter Healthcare, Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1123-24 (7th Cir. 1994)]. The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. These two types of rebuttals are direct attacks on the credibility of the employer's proffered motivation for firing plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed "a suspicion of mendacity." [*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)]. As *Hicks* teaches, such a showing permits, but does not require, the factfinder to infer illegal discrimination from the plaintiff's prima facie case.
>
> The second showing, however, is of an entirely different ilk. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

---

14. Though the parties sometimes discuss the maintenance, cleanliness, and safety issues as three separate problems, the issues do not actually appear to be independent. Rather, the evidence indicates that in many situations failure to properly maintain the equipment led to cleanliness problems and potential safety issues, while in other situations lack of cleanliness lead to equipment breakdowns requiring unexpected maintenance. Accordingly, it is not practical to analyze the cleanliness, maintenance, and safety issues as three entirely independent reasons for Rodenberg's termination.

29 F.3d at 1084.

Rodenberg argues that he can show pretext by either the second or third method of proof, arguing that there remains a question of fact as to whether Hill & Griffith's articulated reasons for terminating Rodenberg actually motivated the termination decision or were sufficient to motivate it. Based on the evidence Rodenberg points to, it appears the second method of proof is most applicable. Rodenberg sets forth sufficient evidence to create a question of fact as to whether the maintenance, cleanliness, and safety issues at the Cincinnati plant actually motivated Hill & Griffith's decision to terminate him.

The problems that Hill & Griffith now claim to have prompted Rodenberg's termination were present for years, and there is at least some evidence that Hill & Griffith acknowledged that those problems were not entirely due to Rodenberg's management and that Hill & Griffith did not find the problems to be serious enough to warrant Rodenberg's termination. For example, there were persistent problems with maintenance and cleanliness when Rodenberg served as manager of the Burbank plant, and it is not clear that Rodenberg was ever able to resolve or improve those issues. Nevertheless, in 1993, Hill & Griffith promoted Rodenberg to the position of manager at the Cincinnati plant, the largest of Hill & Griffith's plants. A reasonable jury could infer that if Hill & Griffith had fully attributed the Burbank plant's maintenance and cleanliness issues to Rodenberg, the company would not have selected him to manage an even larger plant.

Rodenberg continued to serve as the Cincinnati Plant Manager for approximately fourteen years despite ongoing maintenance and cleanliness issues. During that time his salary nearly doubled. Hill & Griffith points to evidence that Rodenberg did not receive his full raise in

14

2002, but there is no evidence that he did not receive a full raise in other years.  Hill & Griffith also points to evidence that Rodenberg was again warned to address plant cleanliness in a 2003 performance review.  However, despite the warning, Greek, Jr. also noted in that review that Rodenberg was a "good employee" and that Rodenberg "has done a good job dealing with adversity," suggesting that there were factors outside of Rodenberg's control that contributed to the cleanliness problem.  (Doc. 19-1 at 1.)  In that performance evaluation, which was apparently the only formal evaluation Rodenberg received during his employment with Hill & Griffith, Greek, Jr. gave Rodenberg an overall rating of 89.88 out of 100.  Under the rating system used, a rating of 100 meant "acceptable," a rating of 1-99 meant "needs improvement," and a rating of 0 meant "unacceptable," putting Rodenberg's 89.88 rating at the high end of the "needs improvement" category.  (*See id.*)

There is additional evidence suggesting that some of the Cincinnati plant's problems may not have been attributable to Rodenberg's management.  One of the recurring problems that Hill & Griffith highlighted in its Motion for Summary Judgment was the fact that equipment often broke down due to debris left in the coal.  Rodenberg maintained that the quality of coal the Cincinnati plant received was poor and contained a lot of debris to begin with, making it harder for the person charged with sifting through the coal to catch everything.  Rodenberg was not the only person who believed that the coal was of poor quality and that a different coal should be used.  As noted above, in an email dated two days prior to Rodenberg's termination, Hill & Griffith's purchasing manager suggested that the company switch to a different type of coal due to the ongoing problems with coal contamination.

Finally, Rodenberg points to evidence that there was a common practice amongst Hill &

15

Griffith management of considering younger employees to be in a different category than older employees and that Greek, Jr., the person who actually terminated Rodenberg, was biased against older employees. The testimony of both Welsh and Nuss reveals that there was a shared opinion among Hill & Griffith upper management that the older salespeople were operating at a less aggressive level than the younger salespeople. Rodenberg was not a salesperson. However, the potential bias against older salespeople is probative of whether there was a more widespread bias, particularly when viewed in light of Greek, Jr.'s statement about his biggest problems being the sixty-year-old salespeople and fifty-year-old managers.

      The Sixth Circuit has found similar statements were insufficient to demonstrate pretext for age discrimination where there is sufficient evidence to show that the statements were in fact made in the context of a legitimate concern about losing a number of skilled employees due to approaching retirements. *See Rowan*, 360 F.3d at 549 (statements made by the plaintiff's superiors about the average age of the workforce did not evince a bias against older employees where the "evidence indicate[d] that the concern for the average age of the work force in the plant was entirely motivated by the" fear that the industry in which the defendant did business "was in danger of having a high percentage of its most important, highly skilled workers retire soon"); *see also Williams v. Tyco Elec. Corp.*, 161 F. App'x 526, 533 (6th Cir. 2006) (a statement regarding the loss of "only a few good performers, whose average age is about 60," did not amount to direct evidence of age discrimination where those employees, along with a number of younger employees, had elected to take severance packages and there was no evidence of a goal to eliminate older employees). However, this case is distinguishable on several points. First, there is a question of fact as to when and in what context Greek, Jr. made

the statement.  Greek, Jr. admits to stating something about sixty-year-old salespeople and fifty-year-old managers, but maintains that he made that statement in the context of a meeting regarding employee succession that took place in December 1999 or 2000.  Rodenberg testified that Greek, Jr., made the specific statement at issue in late 2006 during a cocktail hour at a meeting of the plant managers.  Therefore, it appears Greek, Jr. and Rodenberg are referring to two different statements made in different contexts.

Moreover, there is no evidence in this case that Greek, Jr. was actually concerned about impending retirements in the fall of 2006.  Additionally, unlike in *Rowan*, where the evidence showed the defendant had legitimate fears "that most of the workers with critical skills were eligible or nearly eligible for retirement," 360 F.3d at 549, the evidence in this case suggests that Greek, Jr. and other members of upper management thought the older employees were actually less skilled than the younger employees.  Although a rational trier of fact may believe Greek, Jr.'s explanation for the statement about fifty-year-old managers, there is sufficient contrary evidence to support a conclusion that the statement represents a general bias against older employees.  Such questions of fact are traditionally reserved for a jury.

**IV.   CONCLUSION**

Rodenberg set forth sufficient evidence to demonstrate a question of fact as to whether Hill & Griffith terminated him because of his age.  The Court therefore **DENIES** Defendant's

Motion for Summary Judgment.

    IT IS SO ORDERED.

                                                                                 ___s/Susan J. Dlott_____
                                                                                Chief Judge Susan J. Dlott
                                                                                United States District Court